Dear Mr. C. Irving Pinder
Your predecessor asked for our opinion concerning the effect of 1999 amendments to the Maryland Physician Assistants Act. In particular, he asked whether a physician who enters into a delegation agreement with a physician assistant under the amended law may, if that physician practices in a nonhospital setting, designate "alternate supervising physicians" to carry out the physician's obligation to supervise the medical acts delegated to the physician assistant in the agreement.
Although the answer to this question is not entirely free from doubt, we conclude that the Act does not allow for the designation of alternate supervising physicians in a delegation agreement between a physician and a physician assistant who practice in a nonhospital setting. While the 1999 amendments grant a physician greater flexibility in supervising a physician assistant, they also emphasize that the physician who enters into a delegation agreement with a physician assistant remains personally responsible for the supervision of the physician assistant. To the extent that a physician practicing outside a hospital relies on another physician to cover his or her practice, the substitute physician may only delegate medical acts and supervise a physician assistant under a separate delegation agreement.[1]
 I Background
A. Physician Assistants
The training and employment of physician assistants as health care providers first emerged in the United States during the mid-1960s. See Coleman Shellow, Extending Physician's Standard of Care to Non-Physician Prescribers: The Rx for Protecting Patients, 35 Idaho L.Rev. 37, 62 (1998). The physician assistant profession developed as medical corpsmen returned from the Vietnam War with advanced technical sophistication in delivering medical services. Id. at 62 n. 101. Since that time, nearly 30,000 individuals have been trained as physician assistants in a variety of specialties and functions. Id.
B. Early Regulation of Physician Assistants under Board Regulations
Maryland law has permitted physicians to delegate medical duties to physician assistants and others since the early 1970s. In 1972, before the enactment of legislation that specifically governed physician assistants, the General Assembly authorized licensed physicians to delegate duties to others "in accordance with regulations to be promulgated by the Board." See Chapter 701, Laws of Maryland 1972, codified at Annotated Code of Maryland, Article 43, § 122(b)(6) (1971 Repl. Vol., 1972 Supp.), later recodified as Health Occupations Article ("HO"), § 14-304
(1981).
In 1975, the State Board of Medical Examiners, the predecessor of the current Board of Physician Quality Assurance (the "Board"),[2] adopted regulations permitting the delegation of medical acts to physician assistants. See COMAR 10.27.04 (1975). The Board revised those regulations in 1981. COMAR 10.32.03
(1981).
1. Registration of Physician Assistants and Their Job Descriptions
The regulations provided for the registration of physician assistants, subject to the approval of the Board. The prospective physician assistant was required to submit information about his or her background and, after 1981, continuing registration was made contingent on the applicant's passage of a national certifying examination. COMAR 10.27.04.03 (1975); COMAR10.32.03.04 (1981).
Under the 1975 regulations, a physician who employed a physician assistant was required to provide the Board with written notice of the employment, as well as "a complete resume of the duties to be delegated . . . and the exact nature of the supervisory relationship."
COMAR 10.27.04.04A (1975). The 1981 regulations expanded this requirement, providing for "registration" of a detailed "job description" for the physician assistant. COMAR 10.32.03.05
(1981). The Board was to review the proposed duties and supervisory relationship for conformance with the regulations; and the registration of the job description was not valid until the job description was approved by the Board. Id.
2. Supervision of Physician Assistants
While the regulations gave physicians broad discretion to delegate medical duties to physician assistants, they also made it clear that the physician remained ultimately responsible for the treatment and care of patients. COMAR 10.27.04.06 (1975); COMAR 10.32.03.07 (1981). They did not permit physicians to delegate either "the ultimate responsibility for diagnosis or therapy" or "the duty of independently prescribing or dispensing drugs." COMAR 10.27.04.05 (1975); COMAR 10.32.03.06 (1981).
The 1981 regulations were flexible on how a physician could supervise a physician assistant. They stated that "[a]dequate supervision . . . may be achieved by the personal presence of the physician or the physician's participation by other means approved by the Board, such as through telephone contact or chart review." COMAR 10.32.03.03A (1981). In particular, "[a]dequate supervision does not necessarily require on-site supervision in all cases." COMAR 10.32.03.03B (1981). The physician assistant was mandated to advise the physician immediately of any undiagnosed condition or significant change in a diagnosed condition; in such a circumstance, the physician was to "direct appropriate treatment and . . . be available to promptly attend the patient." COMAR 10.32.03.03C (1981).
3. Employment Ratio
The early regulations restricted a physician to employing no more than two physician assistants in any noninstitutional practice setting. COMAR 10.27.04.04C (1975); COMAR 10.32.03.05F (1981). Neither the 1975 version nor the 1981 version of the regulations alluded to the possibility of alternate supervisors.
C. Statutory Authority to Register and Regulate Physician Assistants
1. 1986 Attorney General's Opinion
In a 1986 opinion, Attorney General Sachs concluded that, while the Board had statutory authority to regulate physician delegation of medical acts, the registration requirements for physician assistants contained in the Board's 1981 regulations exceeded that authorization. 71 Opinions of the Attorney General 136 (1986). The opinion reasoned that the regulations imposed eligibility and examination requirements akin to a licensing regime for physician assistants, and that such a regime was not then authorized by statute.
Id. at 140.
2. Maryland Physician Assistants Act
Apparently in response to the 1986 opinion, the General Assembly adopted the Maryland Physician Assistants Act later that year. Chapter 759, Laws of Maryland 1986. The Act was initially codified as a new Title 14.5 of the Health Occupations Article, but was later recodified in essentially its present form as Title 15 of that article. See Chapter 6, § 11, Laws of Maryland 1990.[3]
The 1986 Act gave the Board statutory authority to certify physician assistants. In particular, it created a process under which the Board's Physician Assistant Advisory Committee would evaluate the qualifications of each prospective physician assistant, conduct personal interviews of the prospective physician assistant and the supervising physician, and make a recommendation to the Board. HO § 14.5-302(c). The Board would then approve, modify, or deny the request for certification. HO § 14.5-302(d).
While the Act continued much of the pre-existing regulatory practice, it described in greater detail than the predecessor regulations the patient services that a physician assistant could perform. HO § 14.5-301(a)(2).[4] Within that range of services, each individual certified as a physician assistant was limited to performing those services delineated in the job description approved by the Board as part of that individual's certification. HO § 14.5-301(a)(1)(iv); see also HO § 14.5-302(e) (requirement of Board approval to amend job description); HO § 14.5-302(f) (review of job description in conjunction with renewal of certificate).
3. Elimination of Employment Ratio
Unlike the predecessor regulations, the Act set no limit on the number of physician assistants to whom a physician might delegate medical acts in a noninstitutional practice setting. However, it required the supervising physician to provide "on-site supervision or immediately available direction." This standard appears stricter than that in the 1981 regulations, which allowed supervision through chart review in some circumstances. Compare HO § 14.5-101(l) with COMAR 10.32.03.03 (1981).
4. 1991 Regulations — Alternate Supervisors
The 1986 Act directed the Board to adopt implementing regulations, and the Board did so in 1991. See HO § 14.5-205(b)(1); 18:5 Md. R. 594 (March 8, 1991). Those regulations followed the 1986 Act in deleting any restriction on the number of physician assistants a physician in any practice setting might employ.[5] The regulations also introduced the concept of an "alternate" supervising physician. "Alternate" was defined to mean "a physician to whom the supervising physician delegates the duty of supervising the physician assistant." COMAR10.32.03.02B(1) (1991); see also COMAR 10.32.03.02B(12) (defining "physician assistant" as one certified to perform delegated medical acts under the supervision of "the supervising physician or delegatee"). As part of the process for obtaining Board approval of a job description for a physician assistant, the supervising physician was required to identify any alternate supervisors. COMAR 10.32.03.06C(1)(d) (1991). If more than five alternate supervisors were named, the application for approval of the job description had to describe the nature of the alternates' practices. Id. No distinction was made between the authority to designate alternates in hospital and nonhospital settings.
The 1991 regulations also implemented the statutory requirement that the physician be "on-site" or "immediately available" to supervise the physician assistant. An application for approval of a job description had to describe the nature of the supervision that would be provided for the physician assistant. COMAR10.32.03.06C(1)(g) (1991). In addition, the regulations set forth standards for "minimal supervision," to which the supervising physician was to attest. COMAR 10.32.03.06C(2) (1991). Included among those standards were requirements that the physician "be immediately available for consultation and direction to the physician assistant," and, if the physician would not provide "100 percent on-site supervision," that he or she "[i]ndicate how coverage will be provided for management of a patient." COMAR10.32.03.06C(2)(c)-(d) (1991).
D. Authority to Write Medication Orders and Prescriptive Authority
1. 1995 Attorney General's Opinion
In 1994, the question arose whether the Board could adopt regulations permitting physician assistants to write prescriptions for, and dispense medications to, patients, whether in hospitals or in other health care settings. In response to an inquiry from the Secretary of Health and Mental Hygiene, this Office concluded that, under the Physician Assistants Act, the Board could adopt regulations to specify the circumstances under which the job descriptions of physician assistants might include prescribing drugs. 80 Opinions of the Attorney General ___ (1995) [Opinion No. 95-004 (February 1, 1995)]. However, this Office advised that Board regulations could not authorize physician assistants to dispense prescription medicines, because the Pharmacy Act, which governed the dispensing of medications, did not permit physicians to delegate their authority in that regard. Id.
2. Statutory Authority to Write Medication Orders
Apparently in response to the 1995 opinion, the Board adopted emergency regulations and proposed permanent regulations that would allow physician assistants to write medication orders.[6]
However, the regulations were never permanently adopted, at least in part because of a 1997 amendment to the Physician Assistants Act.[7] Chapter 540, Laws of Maryland 1997. That legislation provided statutory sanction for the delegation to physician assistants, under certain circumstances, of authority to write medication orders in institutional settings. In particular, it permitted the Board to approve an amended job description under which a physician assistant could write medication orders in a hospital, public health facility, correctional facility, or detention center.[8] The legislation established parameters for such an authorization, including a requirement that "a supervising physician who has been approved by the Board to supervise a physician assistant . . . countersign all medication orders" written by the physician assistant. Id., § 15-302(d)(2)(ii)2.
E. The 1999 Revision of the Physician Assistants Act
In 1999, the Legislature revisited the supervision of physician assistants, while providing new statutory standards under which they might exercise prescriptive authority. Chapter 655, Laws of Maryland 1999. The 1999 legislation substituted the concept of a "delegation agreement" between the physician and physician assistant for the prior requirement of a job description; it limited the number of delegation agreements into which a physician might enter in a nonhospital setting; it expanded the permissible methods of supervision; it recodified in a new section the authority of a physician assistant to write medication orders in an institutional setting; and it spelled out in another new section the manner in which a physician assistant might exercise broader prescriptive authority.
1. Delegation Agreements Replace Job Descriptions
Instead of the prior practice under which, as part of the certification process, the physician assistant applied to the Board for approval of a job description, the statute now conditions a physician's authority to delegate medical acts on Board approval of a "delegation agreement" between the physician and physician assistant. HO § 15-302. The Board's Physician Assistant Advisory Committee reviews the proposed delegation agreement, may interview the physician and physician assistant, and makes a recommendation to the Board whether to approve, modify, or reject the agreement. HO § 15-302(d)-(f).
The delegation agreement must describe the qualifications of both the physician and the physician assistant, the settings in which the physician assistant will practice, and "the continuous physician supervision mechanisms" appropriate to those settings. HO § 15-302(b)(1)-(3). The supervising physician must attest that the delegated medical acts are within the physician's scope of practice and appropriate to the physician assistant's education, training, and competence. HO § 15-302(b)(4). The supervising physician must accept responsibility for any care given by the physician assistant, and must pledge to exercise continuous supervision and to respond in a timely manner when contacted by the physician assistant. HO § 15-302(b)(5)-(7). Significantly, the Act now explicitly provides that "a physician assistant is the agent of the supervising physician in the performance of all practice-related activities, including the oral, written, or electronic ordering of diagnostic, therapeutic, and other medical services." HO § 15-301(e).
2. Limit on Number of Delegation Agreements in Nonhospital Setting
The 1999 legislation prohibits the Board from authorizing a physician, by the mechanism of delegation agreements, to delegate medical acts to more than two physician assistants in a nonhospital setting. HO § 15-302(i). The legislation thus reinstitutes the 2:1 employment ratio that the Board had adopted by regulation during the 1970s and 1980s.
3. Expanded Methods of Supervision
The 1999 legislation includes a revised definition of "supervision," which emphasizes "physician oversight of and acceptance of direct responsibility for the patient services and care rendered by a physician assistant." The definition specifies examples of how a physician may supervise a physician assistant without being physically present. In particular, the definition now makes it clear that the physician may be available to the physician assistant "through written instructions, or by electronic means," as well as "in person." HO § 15-101(s)(2).
4. Elimination of Regulatory Recognition for Alternate Supervisors
The 1999 amendments do not address the use of alternate supervising physicians. Thus, the Physician Assistants Act continues to make no explicit reference to that practice. However, in early 2000 the Board amended its regulations to remove authorization for the designation of alternate supervising physicians in nonhospital settings. 27:1 Md. R. 76-77 (January 14, 2000) (amending, among other provisions, COMAR10.32.03.02B(1), .06C-D).[9]
5. Medication Orders and Prescriptive Authority
The 1999 legislation adds two new sections to the Act dealing with delegation of authority to write medication orders and delegation of prescriptive authority. It recasts the 1997 provision that permitted physician assistants working in certain institutions to write medication orders, so that this authority must appear in a delegation agreement rather than in a job description, and it recodifies the provision as new HO § 15-302.1.
Another new section, codified as HO § 15-302.2, concerns the delegation of prescriptive authority to physician assistants in any practice setting. "Prescriptive authority" is defined to mean "the authority . . . to prescribe and administer controlled dangerous substances, prescription drugs, and medical devices." HO § 15-101(o). For a physician to delegate this authority to a physician assistant, the delegation agreement must contain a number of provisions: a notice of the intent to delegate prescriptive authority and a pledge to comply with applicable federal and State regulations, HO § 15-302.2(a)(1)-(2); an attestation that medical charts and records will reflect any prescriptions written by the physician assistant and will be reviewed and cosigned by the supervising physician "within a period reasonable and appropriate to the practice setting and consistent with current standards of acceptable medical practice," HO § 15-302.2(a)(3); an attestation that all prescriptions written by the physician assistant will legibly identify the physician assistant and the supervising physician, HO § 15-302.2(a)(4); and evidence that the physician assistant has satisfied applicable education and eligibility requirements, HO § 15-302.2(a)(5)-(6).
 II Analysis
Your predecessor asked whether, under the current version of the Maryland Physician Assistants Act, a delegation agreement between a physician and a physician assistant who practice in a nonhospital setting may designate alternate supervising physicians. Under the 1999 amendments, a physician outside a hospital setting may enter into delegation agreements with no more than two physician assistants. HO § 15-302(i). However, if alternate supervisors may be named in such a delegation agreement, a physician might end up supervising more than two physician assistants at the same time. This inquiry thus raises the question whether the concurrent supervision of more than two physician assistants would be inconsistent with the express statutory limit on the number of delegation agreements into which a physician in a nonhospital setting may enter.
On the one hand, one might read HO § 15-302(i) as placing a limit on the number of physician assistants to whom a physician may delegate medical acts, but not the number of physician assistants that a physician may supervise) i.e., to set a "delegation ratio", but not a "supervisory ratio." A policy argument may be advanced in favor of this interpretation based on the premise that a delegating physician who is not on site may inevitably rely on other physicians to help supervise physician assistants. Under this view, the designation of "alternate" supervisors, subject to review and approval by the Board, appears preferable to having no on-site physician supervision or to leaving alternate supervisors unidentified.
However, for several reasons we conclude that the Act does not permit the designation of "alternate supervising physicians" in nonhospital settings. First, the naming of alternates in a delegation agreement for a nonhospital setting appears to be at odds with the current design of the statute, which generally links the right to delegate to the obligation to supervise. While the Act has always prohibited a physician assistant from practicing "independent of a supervising physician,"[10] in its 1999 revision of the Act the General Assembly focused on the supervisory relationship between the physician assistant and the delegating physician, substituting delegation agreements for job descriptions.
In imposing various obligations on "the supervising physician," the current statute appears to equate "the supervising physician" with the physician who has entered into a delegation agreement with the physician assistant. For example, the statute limits the physician assistant's practice to medical acts "[d]elegated by the supervising physician." HO § 15-301(b)(1) (emphasis added). Emphasizing that the delegating physician is responsible for the care provided by the physician assistant, the statute declares that the physician assistant is "the agent of the supervising physician." HO § 15-301(e) (emphasis added). That agency relationship is to be set forth in a delegation agreement, which the statute defines as "a document that is executed by a supervising physician and a physician assistant . . . ." HO § 15-101(h) (emphasis added).
The delegation agreement must contain "[a] description of the qualifications of the supervising physician." HO § 15-302(b)(1) (emphasis added). The medical services provided by the physician assistant are limited by the scope of practice of "the supervising physician." HO § 15-302(b)(4). In addition, in the application for approval of a delegation agreement, "the supervising physician" must promise to provide continuous supervision by mechanisms described in the agreement, must accept responsibility for any care given by the physician assistant, and must promise to respond in a timely manner when contacted by the physician assistant. HO § 15-302(b)(5)-(7). As part of the process to obtain Board approval of a delegation agreement, "the supervising physician" must comply with other requirements set by the Board and must submit to an interview with the Board's Physician Assistant Advisory Committee. HO § 15-302(c)(1), (e). Finally, the statute directs the Board to notify "the supervising physician" of any decision to modify or disapprove the application. HO § 15-302(f). These various references to "the supervising physician" clearly apply to the physician who enters into a delegation agreement with the physician assistant.
The focus on the responsibility of the delegating physician, and the scope of the practice of each physician assistant, is understandable, in light of the other key aspect of the 1999 legislation. Under the 1999 amendments, a physician practicing outside an institutional setting can, for the first time, delegate to a physician assistant the authority to write prescriptions. The General Assembly appears to have been especially concerned that this new prescriptive authority be exercised under the close supervision of the delegating physician, inasmuch as the legislation demands that any delegation agreement granting prescriptive authority include the attestation of "the supervising physician" that the physician assistant's prescribing activities will comply with applicable federal and State regulations, that all medical charts and records noting prescriptions written by the physician assistant will be reviewed and cosigned by "the supervising physician," and that all prescriptions written by the physician assistant will include "the supervising physician's" name, business address, and business telephone number. HO § 15-302.2(a)(2)-(4). Again, this provision plainly contemplates that the physician who enters into the delegation agreement with the physician assistant is "the supervising physician."[11]
Second, the legislative history of the 1999 amendments indicates that, in adding a delegation ratio to the statute, the General Assembly was concerned about the number of physician assistants who might be performing medical acts in a nonhospital setting under the supervision of one physician.[12] Notably, while the original version of the legislation would have set a delegation ratio of four physician assistants per physician, the General Assembly amended the original bill to reduce the nonhospital delegation ratio to two physician assistants per physician. This amendment responded to opposition expressed by the Board, which pointed out that, given the more flexible definition of supervision in the bill, a single physician might simultaneously practice out of five offices by employing physician assistants under four delegation agreements. Position Paper of Board of Physician Quality Assurance submitted to House Environmental Matters Committee concerning House Bill 674 (1999).
The Legislature's evident concern with adequate supervision of physician assistants, particularly outside institutional settings, as well as the scheme of assigning responsibility for the acts of a physician assistant to "the supervising physician," could easily be undermined if members of a group of physicians could simply designate each other as alternate supervisors for a large number of physician assistants.[13] For example, under the statute each doctor in a six-physician group practice can enter into delegation agreements with two physician assistants. If these physicians could designate all other physicians in the group as alternate supervisors in their respective delegation agreements, one physician could end up simultaneously supervising up to 12 physician assistants) i.e., two as the delegating physician, and up to ten as an alternate supervisor. This would undermine the statutory delegation ratio, as well as the Legislature's apparent intent to place responsibility for medical services provided by a physician assistant squarely on the delegating physician.
Finally, while not dispositive of the Legislature's intent in 1999, it is instructive that the General Assembly has subsequently rejected amendments to the Act that would have explicitly authorized the use of alternate supervising physicians in any practice setting and would have delineated the circumstances of, and limits on, alternate supervision. See House Bill 1068 (2001); House Bill 1324 (2000).[14]
 III Conclusion
In summary, the Maryland Physician Assistants Act, as amended in 1999, permits a physician practicing in a nonhospital setting to enter into delegation agreements with no more than two physician assistants. The amended Act grants such a physician some flexibility in meeting the obligation to supervise those physician assistants, but does not allow for the designation of "alternate supervising physicians." To the extent that such a physician relies on another physician to cover his or her nonhospital practice, the substitute physician may delegate medical acts and supervise a physician assistant only under a separate delegation agreement. J. Joseph Curran, Jr. Attorney General
Judith A. Armold Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions Advice
[1] Our opinion is consistent with advice previously provided to the Board by Assistant Attorneys General Thomas W. Keech and Kimberly Cammarata.
[2] The State Board of Medical Examiners was succeeded by the State Board of Physician Quality Assurance in 1988. Chapter 109, Laws of Maryland 1988. In this opinion, the term "Board" refers to the Board of Medical Examiners before July 1, 1988 and to the Board of Physician Quality Assurance after that date.
[3] In this opinion, references to the original version of the Maryland Physician Assistants Act are to HO § 14.5-101 et seq. (1986 Repl. Vol., 1986 Supp.). References to the current version of the Act are to HO § 15-101 et seq. (2000 Repl. Vol.).
[4] That paragraph provided:
Patient services provided by a physician assistant are limited to:
(i) 1. Taking complete, detailed, and accurate patient histories; and 2. Reviewing patient records to develop comprehensive medical status reports; (ii) Performing physical examinations and recording all pertinent patient data; (iii) Interpreting and evaluating patient data as authorized by the supervising physician for the purpose of determining management and treatment of patients; (iv) Initiating requests for or performing diagnostic procedures as indicated by pertinent data and as authorized by the supervising physician; (v) Providing instructions and guidance regarding medical care matters to patients; (vi) Assisting the supervising physician in the delivery of services to patients who require medical care in the home and in health care institutions, including: 1. Recording patient progress notes;
2. Issuing diagnostic orders that must be countersigned by the supervising physician within 24 hours; and 3. Transcribing or executing specific orders at the direction of the supervising physician; and (vii) Other medical acts permitted to be delegated under an approved job description.
HO § 14.5-301(a)(2) (1986 Repl. Vol., 1986 Supp.). The description of services provided by physician assistants remains essentially the same in the current law, except that the final catch-all provision has been replaced with a provision that encompasses writing medication orders and exercising prescriptive authority. See HO § 15-301(c) (2000 Repl Vol.).
[5] While there is no indication in the legislative or regulatory record why the 2:1 employment ratio was dropped in the Board's 1991 regulations, the change may have been related to antitrust concerns. Because the limit on the employment of physician assistants was not set forth in statute at that time, it might not have been insulated by the state action doctrine from a challenge under the antitrust laws. See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97 (1980) (to be immune from attack under the antitrust laws a restraint of trade must be "clearly articulated and affirmatively expressed as state policy" and must be "actively supervised" by the state itself); Parker v. Brown, 317 U.S. 341 (1943). See also 71 Opinions of the Attorney General 136, 139 n. 1 (1986) (noting impending antitrust review of Board's regulations).
[6] 23:24 Md. R. 1676 (November 22, 1996) (emergency regulations effective from November 8, 1996 to October 1, 1997); 23:16 Md. R. 1198 (August 2, 1996) (proposed regulations).
[7] See 24:17 Md. R. 1214 (August 15, 1997) (withdrawing pertinent portions of the August 2, 1996 proposal).
[8] Under the 1997 legislation, "medication order" is defined as "a directive written in a medical chart: (1) for controlled dangerous substances, noncontrolled substances, or nonprescription medications; and (2) in accordance with the protocols of a hospital, public health facility, correctional facility, or detention center." HO § 15-101(k).
[9] The revised regulations allow for alternate supervisors in hospitals) the practice setting for which there is no statutory restriction on the number of delegation agreements into which a physician may enter. See COMAR 10.32.03.02B(a) (defining "alternate supervising physician").
[10] See HO § 15-301(a) (2000 Repl. Vol.); HO 14.5-301(b)(2) (1986 Repl. Vol., 1986 Supp.).
[11] The frequent use of the definite article — i.e., references to "the supervising physician" — in language added by the 1999 amendments also suggests that the Legislature intended for the delegating physician to be the supervising physician and did not contemplate alternate supervisors in a nonhospital setting. In addition to the provisions cited in the text, see also HO § 15-301(i) (patient being treated regularly for a life threatening, chronic, degenerative, or disabling condition shall be seen initially and at specified intervals by "the supervising physician").
Nearly all instances in which the Act employs the indefinite article before "supervising physician" — i.e., "a supervising physician" — occur in the provision governing the authority to write medication orders. See HO § 15-302.1(a)(2)(ii)2 and 8 (facility where physician assistant will write medication orders must attest to having protocols that require "a physician who has been approved by the Board to supervise a physician assistant" to countersign the medication orders and notify the Board if the physician assistant's authority to write medication orders has been revoked); HO § 15-302.1(a)(5) and (6) (in facility where medication order is written, it must be countersigned by "a supervising physician" within 48 or 72 hours); HO § 15-302.1(a)(8) (in emergency room, a physician assistant must discuss a patient's treatment plan, including medication orders, with "a supervising physician" before the patient is discharged). Notably, this provision applies in hospital settings, where there is no limit on the number of delegation agreements into which a physician may enter, and where Board regulations permit the use of alternate supervising physicians. See, e.g., COMAR10.32.03.02B(1).
[12] Most of the materials in the legislative files for the 1999 legislation concern the merits of permitting physician assistants to write prescriptions in settings not covered by their previous authority to write medication orders. The only mention of the practice of designating alternate supervisors appears in a compendium of the American Academy of Family Physicians, included in the bill file of the House Environmental Matters Committee. That compendium suggested that a physician might provide supervision to non-physician providers by designating alternates, and stated that "[e]xplicit alternate supervising physician requirements are usually set forth in state law."
[13] A number of other states specifically restrict the number of physician assistants that a physician may supervise, generally in ratios of 2:1 or 4:1. See Gore, Physician's Liability for Mistakes of a Physician Assistant, 21 J. Legal Med. 125, 127-29 (2000) (summarizing various state laws). Notably, at least one state explicitly provides for an "alternate supervising physician" and permits the alternate to exceed the otherwise mandatory 2:1 ratio under certain circumstances. See 225 Ill. Comp. Stat. Ann. 95/4 (definition of "alternate supervising physician"), 95/7(permitting alternate supervising physician to supervise more than two physician assistants when primary physician unable to provide supervision). Another state permits a physician to supervise up to four physician assistants, but requires that the physician be physically present to supervise more than two physician assistants simultaneously. Mich. Comp. Laws Ann. § 333.17048(1).
[14] The 2001 bill would have added a definition of "alternate supervising physician," restricted a physician assistant working under the supervision of an alternate to medical acts within the scope of practice of that alternate, and limited an alternate to supervising no more than four physician assistants at any one time in a noninstitutional setting. House Bill 1068 (2001).
The 2000 bill would have recognized the use of "alternate supervising physicians" in both institutional and noninstitutional settings. With respect to nonhospital settings, the bill would have set a number of conditions on the use of alternate supervisors. A delegating physician would have been required to register the names of any alternate supervisors, as well as other information about those physicians, and the alternate supervisors themselves would have been required to make a number of attestations in a writing filed with the Board. In addition, the bill would have established a supervisory ratio for an alternate supervisor, confined a physician assistant working under the supervision of an alternate to acts within the scope of practice of that alternate, and limited the duration of supervision by the alternate supervisor to 30 days per calendar year. House Bill 1324 (2000).
 *Page 174